UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
ANDRE SMITH,

                            Plaintiff,                          Docket No.: 12-CV-4922

-against-


THE CITY OF NEW YORK, P.O. HANA
KURIAN, both individually and in his official
capacity as a police officer, and P.O. MIGUEL          **DECLARATION OF**
LAGARA, both individually and in his official          **DEREK S. SELLS IN SUPPORT**
capacity as a police officer, and "JOHN DOES"          **OF PLAINTIFF'S SUR-**
and "JANE DOES" said names being fictitious            **REPLY IN OPPOSITION**
and presently unknown persons believed to be           **TO DEFENDANTS'**
police officers and personnel of the New York          **SUMMARY JUDGMENT**
City Police Department,                                 **REPLY**

                  Defendants and Third-Party Plaintiffs,

        -against-

ST. BARNABAS HOSPITAL and TRANSCARE
NEW YORK, INC. d/b/a METROCARE,

                        Third-Party Defendants.
-----------------------------------------------------------X

# EXHIBIT 18

WALTER SIGNORELLI, ESQ.
1992 Commerce Street
Yorktown Heights, New York 10598


August 2, 2013


The Cochran Firm
233 Broadway, 5th floor
New York, N.Y., 10279

Re: Andre Smith v. City of New York, et al.
    U.S. District Court, Southern District of New York, 12-CV-4922

    1. Pursuant to plaintiff's request and in accordance with Federal Rules of Civil Procedure, Rule 26 (a) (2), I have prepared this report, which constitutes my initial evaluation and conclusions within a reasonable degree of professional certainty of the actions and procedures employed by members of the New York City Police Department (NYPD) in connection with this matter. My fee for preparation is $300 per hour and $2400 per day or part thereof for deposition or trial testimony. This evaluation is based on:

    A. A review of the documents provided;
    B. My experience, training and education, and professional background, which are
        described below;
    C. NYPD Patrol Guide.

    2. I am a retired member of the New York City Police Department (NYPD), having served for more than (31) thirty-one years. During my tenure, I held the ranks of Police Officer, Sergeant, Lieutenant, Captain, Deputy Inspector, and Inspector, and served in numerous capacities, including patrol officer, patrol sergeant, anti-crime sergeant, lieutenant tour commander, Executive Captain of the 46th Precinct, Bronx; Commanding Officer, Manhattan North Public Morals Division; Commanding Officer of the 79th Precinct in Bedford-Stuyvesant, Brooklyn; Commanding Officer, Staff Services Section of the Personnel Bureau; Commanding Officer, 24th Precinct., Upper Manhattan; Executive Officer, Bronx Narcotics Division; Commanding Officer, License Division; Executive Officer, Narcotics Division; Executive Officer, Manhattan North Narcotics Initiative; and Executive Officer, Brooklyn South Detective Division.

    3. During my tenure, I conducted, supervised, and reviewed thousands of arrests and many incidents involving emotionally disturbed persons. All of the positions noted above

1

entailed training and supervision responsibilities regarding arrests, emotionally disturbed persons, and use of force.

4.  Since my retirement from NYPD, I have taught police science and criminal law courses at John Jay College of Criminal Justice and St. John's University, including courses in police administration, criminal investigations, and criminal procedure law.  I have been retained as a consultant by both plaintiffs and defense in a number of police liability cases, and have testified as a police procedures expert in both State and Federal courts.

## MATERIALS REVIEWED

5.  The following is a list of materials pertaining to the incident and individuals involved that I have reviewed thus far:

        a.  Deposition of Police Officer Padilla;
        b.  Deposition of Police Officer Moroney;
        c.  Deposition of Police Officer Lajara;
        d.  Deposition of Police Officer Kurian;
        e.  Deposition of Lieutenant Grizzard;
        f.  Deposition of Police Officer Bruno Joseph;
        g.  Deposition of Police Officer Montanez;
        h.  Deposition of Police Officer O'Dwyer;
        i.  First Amended Verified Complaint;
        j.  50H hearing transcript;
        l.  NYPD Sprint report;
        m.  Ambulance Call Report;
        n.  FDNY call report;
        o.  NYPD memo books for Lt. Grizzard, POs Montanez, Keating (Moroney), Bruno, Padilla, Lajara;
        p.  50H hearing transcript of Andre Smith;
        q.  Deposition of EMT James Geltzer;
        r.  Deposition of EMT Mack;
        s.  Deposition of Plaintiff, Andre Smith.

## SUMMARY OF FACTS

6.  On February 3, 2012, the plaintiff, Andre Smith, called 911 multiple times. He called to report a crime that had occurred at his residence at 1523 Taylor Avenue, second floor, apartment 10, Bronx, New York. The Sprint report stated in abbreviations: "Perp female, on fire escape, female black, dark-skinned, black coat, fled toward Archer, male caller, Smith, no weapons." According to the testimony of Mr. Smith, he called the police to report the theft of his money by a female who had been in his apartment with him. Two uniformed police officers came to his apartment. Smith testified that the officers spoke to him but left without taking action or a report. He called 911 again, and a second set of officers came to his apartment. They also left without taking action or a report. At

2

0720 hours, a third set of officers came to his apartment. He testified that at the doorway of his apartment, "They put me black handcuffs. They put my hands behind my back, picked me up by my elbows on each side of me and dropped my on my forehead on the marble floor." (17:8-13). Smith testified that he was unable to move and was taken to St. Barnabus Hospital where he underwent spinal surgery.

7. According to police documents and testimony, at 0344 hours, NYPD Police Officers Padilla and Joseph, 43rd Precinct, Sector J, were dispatched by Central to the residence. At 0348 hours, the officers arrived at the location. In the deposition testimony of Smith, he admitted making insulting remarks and gestures to the officers, and when the officers left his apartment, they kicked his door and broke a plate that was behind the open door. According to the testimonies of Officers Padilla and Joseph, they responded to a report of a robbery (10-32) at the location. They knocked on the apartment door and spoke to the plaintiff, Andre Smith, who stated that a he had hired a prostitute and she had taken his money. Officer Padilla testified that he and his partner left without taking any police action. He also stated that as he left the apartment he shoved a bowl from the doorway with his foot in order to close the door because of the loud music in the apartment. The officers did not prepare a complaint report. Officer Joseph testified that he told Smith, "We cannot make a report for you for an incident like that." Officer Joseph also testified that Padilla shoved a bowl from the doorway to close the door. At 0412 hours, the officers reported the disposition to Central as Unfounded (10-90X). The officer failed to make a memo book entry of this incident. Several hours later, Lieutenant Grizzard informed the officers that Smith had made a complaint to the Internal Affairs Bureau (IAB) alleging that an officer had kicked his door.

8. At 0414 hours, another call was received at 911. The Sprint report noted, "Male complainant states that officer kicked the door." At 0430 hours, Lt. Grizzard responded to the residence to investigate the complaint. Lt. Grizzard met Smith at his residence and observed that the door was able to open and close. The Lieutenant testified that he did not think Smith was an emotionally disturbed person (EDP). The Lieutenant testified that he did not prepare a written report because the complaint was already recorded. At 0517 hours, he reported the disposition as Unnecessary (10-90Y). Officer Montanez, the Lieutenant's driver, testified consistently with the Lieutenant's testimony.

9. At 0516 hours, a call was received at 911 from a female caller. The Sprint report stated, "banging violently on 2 flr apt . . poss apt 8 .. no description of perp joind by othrs mls smoking krak." At 0532 hours, another call was received at 911 from a female caller. The Sprint report stated that a male was "Naked in the hallway," and the male "is fighting with someone." At 0544 hours, PO Moroney and O'Dwyer, 43 Precinct, Sector G, responded to the location. According to Sprint report, the officers arrived at 0547 hours, and at 0552 hours, the officers reported the disposition as Unfounded (10-90X). Officer Moroney testified that she did not speak with anyone at the location, and because the call back number was "no good," she determined that the job was Unfounded. (39:6-7; 57:10). Officer O'Dwyer testified essentially the same as Officer Moroney, and he stated that he did not go into the building. (47:13-16).

3

10.  At 0657 and 0717 hours, calls were received at 911 regarding a naked man banging on doors. NYPD Police Officers Hana Kurian and Miguel Lagara, assigned to 43rd Precinct, Sector H, responded to an ambulance call (10-54). According to the testimony of Officers Kurian and Lagara, at 0720 hours, they arrived at the location (Sprint indicates 0723 hours). They entered the second floor of the building and observed an open apartment door. They said they felt extreme heat and smelled an overwhelming amount of gas emanating from the apartment. Instead of alerting the utility company, the Fire Department, and the neighbors, they entered the apartment, wherein they observed the plaintiff, Mr. Smith, with his head in the oven, which was turned on. When Smith took his head out of the oven, the officers turned the oven off and then moved toward the second floor hallway. According to the officers, Smith followed them and appeared to be an EDP as he was holding his penis and shouting Allah Akbar. The officers tried to keep Smith in the apartment at the same time that they held the door open. The officers placed one handcuff on Smith and as Kurian testified, "we are trying to get the other handcuff and he is resisting and he is flailing his arm and we went down—went down to the floor and we got the other handcuff on." (276:21-25). When Smith was face down on the floor, the officers handcuffed him behind his back, and they held him down to keep him from turning over. (286:17-18). At that point, Kurian called for an ambulance. The Sprint report does not indicate he reported an EDP. The officers did not call for a supervisor or an Emergency Service Unit (ESU) to respond. In his memo book, Kurian did not indicate that Smith was an EDP. At 0744 hours, an ambulance arrived. Smith was placed in a carry chair and moved into the ambulance, and the officers took off the handcuffs from Smith. The ambulance personnel transported Smith to the hospital, and they testified that they did not notice any burns or effects of gas on Smith. The police officers did not escort Smith to the hospital. At 0826 hours, the officers reported that Smith was removed to the hospital. The officers testified that an Aided Card was prepared, but no Aided Card has been located in NYPD records.

11.  In his deposition testimony, Smith denied that he had turned the gas on or put his head in the oven. He denied shouting Allah Akbar or using obscene language or gestures to the officers. According to Smith's testimony, the officers did not enter his apartment and handcuffed him in the hallway outside his apartment. He stated that he complied while being handcuffed, and he testified, "They picked me up by my elbows and dropped me on my forehead."

12.  Emergency Medical Services ambulance was dispatched to the residence for a call classified as an intoxicated person. EMT Geltzer was the driver of the ambulance, and EMT Mack was the technician. During their depositions, Geltzer and Mack reviewed the ambulance call report (ACR). They each testified that they did not recall the incident but the ACR indicated that they arrived on the scene at 0744 hours and found Smith "handcuffed, laying on his side, naked with towel around waist, intox with substance abuse." The ACR indicated that "patient resisted getting up from floor for a while." Smith had an abrasion on his nose and stated, "Can't feel my body" and "My body is sore." The EMTs strapped Smith into a carry chair, placed him in the ambulance, and transported him to St. Barnabus Hospital. EMT Mack testified that "He (Smith) was not moving."(37:2). The EMTs testified that they did not smell gas or notice extreme heat.

4

## OPINION

13.  In my opinion to a reasonable degree of professional certainty NYPD Officers Kurian and Lagara departed from the accepted standards of proper police practices and procedures. If the incident occurred as Smith described, the officers clearly used excessive and unnecessary force by dropping a handcuffed person on his forehead. On the other hand, even if the incident occurred as Officers Kurian and Lagara described, the officers were negligent in that they departed from the accepted standards of proper police practices and procedures. They entered Mr. Smith's apartment without consent or a warrant, arrested him in his apartment without a warrant and without probable cause for the arrest, and used unreasonable force while placing him in custody.

14.  When Officers Kurian and Lagara arrived at the location, they did not observe any criminal activity, but observed an open door to the plaintiff's apartment. According to their testimony, they felt extreme heat and smelled gas or cooked drugs emanating from the apartment so they entered the apartment. However, they did not call for Con Edison or the Fire Department to respond, which any reasonable and well-trained officer would have done had the circumstances been as the officers described. Furthermore, their claim about gas and heat was not supported by the testimony of the EMTs who said they did not smell gas or notice extreme heat. However, assuming, for argument's sake, that gas or heat gave the officers cause to enter the apartment, it would have been for the limited purpose of addressing the gas or heat condition.

15.  The officers testified that they prevented the plaintiff from leaving his apartment because he was naked and children who lived in the building would be going to school at that time. On that basis, they used force to prevent the plaintiff from leaving his apartment, in effect arresting him, which in my opinion was unnecessary and unreasonable because at that time the plaintiff was not doing anything to indicate that he was a danger to himself or the officers. Furthermore, since the arrest was unnecessary and unreasonable, the use of force was unwarranted.

16.  The officers also testified that they used force to take the plaintiff into custody because he was an emotionally disturbed person (EDP). Assuming, only for argument's sake, that he was an EDP, the officers nevertheless failed to utilize proper police tactics regarding the handling of an EDP. They also violated NYPD Patrol Guide guidelines regarding EDPs.

17. The proper police procedure for handling a potentially violent EDP is to isolate and contain that person, establish a zone of safety around the individual, attempt to calm the individual, and wait for a supervisor and emergency service personnel to arrive before attempting to take the individual into custody. Officers are trained that they should not make sudden movements toward an EDP and should not invade their space unless necessary. In this case, despite considering that the plaintiff was an EDP, the officers did not call for a supervisor or ESU to respond, and they did not alert the Communications Division that they were dealing with an EDP. Moreover, instead of

5

maintaining a zone of safety, they confronted Smith and attempted to handcuff him. In the handcuffing process, Smith fell to the floor in a manner that apparently caused his paralyzing injury.

18. Regarding EDPs, NYPD Patrol Guide, Section 216-05 states:
     a. If emotionally disturbed person's actions constitute immediate threat of serious physical injury or death to himself or others:
          1. Take reasonable measure to terminate or prevent such behavior.

     c. In all other cases, if EDP's actions do not constitute an immediate threat of serious physical injury or death to himself or others:
          1. Attempt to isolate and contain the EDP while maintaining a zone of safety until arrival of patrol supervisor and Emergency Service Unit personnel.
          (2) Do not attempt to take EDP into custody without the specific direction of a supervisor.

19. In my opinion, this was a "c" situation. When the officers confronted Smith, he had come away from the oven and was not threatening himself or others; therefore, it was not proper to attempt to handcuff him. The officers should have requested a supervisor and ESU to respond, and they should have set up a zone of safety and awaited a supervisor and ESU before approaching Smith and using force. ESU units are specially trained to handle EDP situations and have specialized equipment that can be utilized to restrain individuals with a minimal amount of force. NYPD Communications Sections automatically notifies ESU to respond to EDP cases, but in this case, the officers did not notify Communications that Smith was an EDP.

20. Assuming, hypothetically, that this was an "a" situation, the officers nevertheless used unreasonable force against the plaintiff. Once the officers removed Smith from the oven, he no longer presented an immediate harm to himself. According to the plaintiff, the officers handcuffed him behind his back, lifted him off the floor, and then threw him to the floor.

21. Regarding the plaintiff's injury, in my opinion, the officers violated proper police practices and procedures when they failed to notify a supervisor that a person they took in custody was injured. When they handcuffed Smith, he was in their custody, either under arrest or as an EDP. NYPD Patrol Guide, Section 212-53 mandates that when a person in custody is seriously injured in connection with police activity, an officer must immediately request the response of a patrol supervisor. A potential crime scene must be safeguarded. Notifications must be made through the chain of command, including to the Borough Command, Operations Unit, Commanding Officer/Duty Captain, Internal Affairs Bureau, and Detective Squad. The duty inspector and the duty chief must be notified, and they must respond to the scene to investigate the incident. When it is determined that a person sustains injury in connection with a police activity, a report must be forwarded to the Deputy Commissioner – Policy and Planning. The above procedures were not followed in this case, which in my opinion was a violation of proper

6

police practices and procedures in that potential crime scene was not safeguarded and a timely investigation was not conducted.

22. Furthermore, no Aided Card on this matter has been found in the NYPD records, indicating either that the officers failed to prepare it, or that NYPD failed to ensure that proper procedures were followed in this case. One purpose of an Aided Card is to alert a supervisor of an incident and for the supervisor to initiated further investigation, if necessary. In this case, no record exists that any such supervision or investigation occurred. In my opinion, if there was a willful failure to prepare an Aided Card, it may have been to cover up the improper conduct of the officers.

23. In addition, in my opinion, the NYPD officers violated proper police practices and procedures by failing to adequately investigate the incidents at 1523 Taylor Avenue and by failing to supervise the police response. Lieutenant Grizzard responded to the location at 0430 hours and learned that Smith had made a complaint about the police actions, but the Lieutenant failed to respond to the subsequent calls to the location that occurred at 0544 hours to which Sector G responded and at 0657 hours to which Sector H responded. Sector G spent only five minutes at the location, which in my opinion was insufficient to conduct a proper investigation. Had the Lieutenant responded at 0544 hours to supervise Sector G, in all probability, a more satisfactory investigation would have been conducted. Furthermore, had the Lieutenant responded at 0657 hours to supervise Sector H, in all probability, the improper arrest would not have been made, and assuming it was an EDP situation, the proper EDP procedures would have been followed, and the injuries to Smith would have been avoided.

## CONCLUSION

24. In my opinion, NYPD officers departed from the accepted standards of proper police practices and procedures in that, among other matters, they entered the plaintiff's apartment without consent or a warrant, arrested him without probable cause, used unreasonable force against him, and caused the plaintiff to suffer a serious injury.

Walter Signorelli

7

| | | |
|---|---|---|
| 7/26/12 | Arciola v. City of Beacon | U.S. District Court<br>Southern District of NY<br>Deposition<br>R. Giampa, Esq. |
| 9/11/12 | Mapledoram v. NYC | NYS Supreme, NYC County<br>Trial<br>Weiss & Rosenbloom |
| 12/7/12 | Panas v. City of Philadelphia | U.S. District Court<br>Eastern Dist.of Pennsylvania<br>Judge Davis<br>Philadelphia City Solicitor |
| 12/11/12 | Mitchell v. Adorno | NYS Supreme, Bronx County<br>Trial<br>Judge Riuz<br>Lenihan & Flamm |
| 12/13/12 | DeMichele v. WCPD | U.S. District Court<br>Southern District of NY<br>Judge Gardephe<br>Trial testimony<br>Krouner Law Office |
| 3/14/13 | Davila v. NYC | NYS Supreme, Kings County<br>Trial testimony<br>Judge Wade<br>Hershel Kulefsky Law Office |
| 3/19/13 | Wharton v. Nassau County | U.S. District Court<br>Eastern District of NY<br>Trial testimony<br>Judge Kuntz<br>Messimo & Panetta |
| 5/23/13 | NYPD v. Hernandez, Respondent | NYPD Trial Room<br>Cronin & Bycsek |
| 7/30/13 | Vasquez v. NYC, Donnelly et al | U.S. District Court<br>Southern District of NY<br>Deposition testimony<br>Emery Celli Brincker Abady |