```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
ANDRE SMITH,

                Plaintiff,

        - against -                          MEMORANDUM AND ORDER

CITY OF NEW YORK, P.O. HANA KURIAN, and       12 Civ. 4922 (NRB)
P.O. MIGUEL LAGARA,

                Defendants.
------------------------------------
CITY OF NEW YORK, P.O. HANA KURIAN, and
P.O. MIGUEL LAGARA,

                Third-Party Plaintiffs,

        - against -

ST. BARNABAS HOSPITAL and TRANSCARE NEW
YORK, INC. d/b/a METROCARE,

                Third-Party Defendants.
------------------------------------X
```
**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

I.   **INTRODUCTION**

Plaintiff Andre Smith developed quadriplegia[1] following an encounter with New York City police officers.  In this action, he sues New York City and the two officers (collectively, the "City") for damages on alternative theories of intentional and negligent conduct.  The City, in turn, sues the third-party

---

[1] The record sometimes refers to Smith's condition as quadriplegia (paralysis of all four limbs) and sometimes as quadriparesis (weakening of all four limbs).  The distinction is immaterial to this motion, and we refer to Smith's condition as quadriplegia or paralysis throughout, without intimating any view on Smith's actual medical status.

defendants (collectively, "St. Barnabas") for negligence on the part of the emergency medical technicians (EMTs) who transported Smith from the scene of the incident to St. Barnabas Hospital.[2]

Pending are two motions for summary judgment. The City moves for summary judgment on Smith's negligence claim (ECF No. 53) on the grounds that the facts support only a finding of intentional misconduct or a finding of no liability. St. Barnabas moves for summary judgment against the City (ECF No. 58, re-filed as ECF No. 68) on the grounds that the EMTs acted in accordance with proper medical practice and that any negligence on their part could not have caused Smith's paralysis.

We deny both motions. Sufficient record evidence supports (1) Smith's alternative theory that the officers were negligent in deciding to handcuff Smith, (2) the City's theory that the EMTs failed to immobilize Smith's neck during transport because they performed an inadequate evaluation of Smith, and (3) the City's theory that the EMTs' failure to immobilize Smith's neck caused or aggravated Smith's condition.

---

[2] Smith has not sued St. Barnabas directly for medical malpractice and no party has sued the individual EMTs.

## II. THE CITY'S MOTION

### A. The Police Incident

At the threshold, we must discuss the set of facts upon which we rely in evaluating a summary judgment motion. The City maintains that we must accept the facts in the light most favorable to Smith (the non-movant), which, according to the City, means accepting the facts that best support Smith's primary claim that the officers intentionally dropped Smith on his head. We disagree. When a defendant challenges a plaintiff's alternative or inconsistent claim at summary judgment, we must consider the record in the light most favorable to sustaining the particular claim that is the subject of the summary judgment motion. In this instance, we rely primarily upon the officers' own version of events, which, according to Smith, best supports Smith's negligence claim.

Police Officers Kurian and Lagara arrived at Smith's apartment at dawn on February 3, 2012, in response to complaints that a naked man at Smith's address was banging on doors. See Defs.' Stmt. Pursuant to Loc. Civ. R. 56.1 ("City 56.1") ¶¶ 31, 33, ECF No. 56. When the officers arrived at Smith's apartment, Smith was naked and emotionally disturbed, with his head in a hot oven. See Dep. of Miguel Lagara ("Lagara Dep.") 120:19-20, 126:11-18, 161:6-14, Decl. of Derek S. Sells in Opp. to Defs.' Mot. for Partial Summ. J. ("Sells

3

Decl."), Ex. 5, ECF No. 80; Dep. of Hana Kurian ("Kurian Dep.") 237:22-24, Sells Decl., Ex. 3.  Once the officers drew Smith away from the oven, Smith followed the officers unsteadily towards the hallway, cursing loudly, and waving his genitals towards the officers.  See Lagara Dep. 131-135; Kurian Dep. 256:18-258:10.

Despite Smith's emotional disturbance, the officers did not call for a supervisor or a specialized unit trained to deal with emotionally disturbed persons.[3]  See Kurian Dep. 260:18-25. The officers instead decided to handcuff plaintiff.  See City 56.1 ¶ 38.  The officers did not consider Smith to have committed a crime.  See Lagara Dep. 145:5-16; Kurian Dep. 271:25-272:4.  Instead, they wished to restrain Smith in order to have him evaluated at a hospital.  See Lagara Dep. 145:13-16.

During the handcuffing process, Smith fell and struck part of his head.  See Pls'. 56.1 Counter Stmt. ¶ 25, ECF No. 82; Defs.' Response to Pls.' Stmt. of Additional Facts ¶ 25, ECF No. 91.  Smith maintains that this trauma, combined with pre-

---

[3] Kurian has explained that the officers did not call for assistance because of the commotion in the background. See Kurian Dep. 261:16-262:10.  If the officers had turned on their radio, then other nearby officers would have heard the noise and converged on Smith's apartment, thus aggravating the situation.  See id.  Under the circumstances, the officers preferred to wait for quiet before calling for support.  See id.  Smith disputes the reasonableness of this approach.

existing factors, caused his quadriplegia. See infra (discussing Smith's medical history).

## B. Police Procedures[4]

The NYPD Police Patrol Guide sets forth procedures for dealing with an emotionally disturbed person. See Patrol Guide § 216-05 (eff. Sept. 28, 2007), Sells Decl., Ex. 9. At the outset, the officer should assess the situation. If the disturbed person presents an immediate threat of serious physical injury to himself or others, the officer should "[t]ake reasonable measures to terminate or prevent such behavior." Id. § 216-05 ¶ 1(a)(1). The officer may also take the person into custody if he is unarmed, non-violent, and willing to leave voluntarily. Id. ¶ 1(b)(1).

Unless the person presents an immediate threat or is willing to leave, the officer should "[a]ttempt to isolate and contain the [person] while maintaining a zone of safety until arrival of patrol supervisor and Emergency Services Unit personnel," and should "not attempt to take [the person] into custody without the specific direction of a supervisor." Id.

---

[4] Although the NYPD Patrol Guide speaks for itself, our understanding of it is informed by the opinion of Smith's expert, Walter Signorelli. See Mem. of Walter Signorelli (Apr. 26, 2014), Sells Decl., Ex. 10. The City argues that we should discount Signorelli's report as unsworn, unqualified, and beyond the proper scope of expert testimony. At this stage, Signorelli appears to be qualified as an expert. Although the City may file appropriate pre-trial motions against Signorelli's testimony, we will not ignore his opinions at this stage, now that he has cured his earlier failure to swear to his opinion. See Decl. of Derek S. Sells in Supp. of Pl.'s Sur-Reply in Opp. to Defs.' Summ. J. Reply, Ex. 22, ECF No. 102.

¶ 1(c)(1), (2). This "zone of safety" is a buffer zone between the disturbed person and officers, usually of at least 20 feet. See id. (definition of "zone of safety").

### C. Discussion

Smith argues that the officers were negligent in that they attempted to handcuff Smith themselves instead of calling for a supervisor or ESU, establishing a zone of safety, and waiting for permission to handcuff Smith. Apart from his primary claim that the officers intentionally dropped him on his head, he does not allege that the officers conducted the handcuffing in an incompetent manner. Rather, his theory is that the very decision to handcuff him was fraught with unnecessary risk.

The City's principal legal argument is that negligence is incompatible with intentional conduct. See, e.g., Mazzaferro v. Albany Motel Enters., 127 A.D.2d 374, 376, 515 N.Y.S.2d 631, 632 (1987) ("[O]nce intentional offensive contact has been established, the actor is liable for assault and not negligence, even when the physical injuries may have been inflicted inadvertently. . . . There is, properly speaking, no such thing as a negligent assault."). Handcuffing a person is unquestionably an offensive battery, and would therefore not typically be actionable as negligence.

However, where a statute offers a police officer the privilege to commit what would normally be considered a

6

battery, the police officer must exercise reasonable care in exercising his discretion.  For example, in McCummings v. New York City Transit Authority, the Court of Appeals sustained a jury verdict of negligence in favor of a plaintiff who was shot and paralyzed by a police officer after allegedly attempting to rob a man on a subway platform.  81 N.Y.2d 923, 613 N.E.2d 559 (1993); see also Lubecki v. City of New York, 304 A.D.2d 224, 758 N.Y.S.2d 610 (1st Dep't 2003) (sustaining a jury verdict of negligence in favor of hostage shot by police).  Even Mazzaferro, relied upon by the City, recognized in dicta that the reasonableness of force exercised by the defendant could have been "an issue in the case if defendants had asserted the defense of privilege or justification for the assault."  127 A.D.2d at 376, 515 N.Y.S.2d at 633.

Here, a statute at least arguably permitted the officers to take Smith into custody.  See N.Y. Mental Hyg. Law § 9.41 (McKinney 2011) ("Any . . . police officer . . . may take into custody any person who appears to be mentally ill and is conducting himself . . . in a manner which is likely to result in serious harm to the person . . . .").  Despite this authority, the officers were bound to exercise reasonable judgment in deciding the means through which to take Smith into custody——whether to do so immediately, or to wait for special personnel and equipment.

7

The Patrol Guide has frequently been accepted as evidence of the standard of care to be exercised by a police officer. See Cerbelli v. City of New York, No. 99-cv-6846 (ARR)(RML), 2008 WL 4449634, at *1–25, 2008 U.S. Dist. LEXIS 109341 (E.D.N.Y. Sept. 8, 2008), aff'd without objection, 2008 WL 4449634, at *1 (E.D.N.Y. Oct. 1, 2008); Lubecki, 304 A.D.2d at 234–35, 758 N.Y.S.2d at 618.  Thus, evidence that the officers violated Patrol Guide procedures is sufficient to survive summary judgment.[5]

Here, Smith is correct that it is a jury question whether the officers complied with the Patrol Guide.  The officers did not call for assistance and did not view Smith as a threat to others, so the officers were in compliance with the Patrol Guide only if (1) the evidence shows that Smith was a danger to himself or others and (2) handcuffing Smith was a reasonable response to the danger.  The officers' expressed concern was that Smith would return to his apartment and attempt suicide.  However, even accepting this view, it does not necessarily follow that handcuffing Smith was a "reasonable" measure.  A

---

[5] We caution, however, that the Patrol Guide does not establish a legal duty beyond the common law's "reasonable person" standard, and that a Patrol Guide violation does not give rise to a presumption of negligence.  See Lubecki, 304 A.D.2d at 234, 758 N.Y.S.2d at 617; Schumer v. Caplin, 241 N.Y. 346, 150 N.E. 139 (1925) (holding that the violation of an administrative rule is only "some evidence of negligence"); cf. Desmond v. City of New York, 88 N.Y.2d 455, 464–65, 669 N.E.2d 472, 477 (1996) (holding that an internal NYPD policy does not constitute a "requirement" that would support a police officer's statutory claim).

8

reasonable jury could conclude that the officers instead could have followed Smith into the apartment to prevent him from turning on his stove or could have drawn Smith into the hallway and closed the apartment door behind him. Furthermore, there is record evidence that the officers' true concern was that Smith's uncontrolled behavior was disturbing children who were passing by on the building's stairwell. See Kurian Dep. 262:16-265:7, 276:14-15; see also Lagara Dep. 131:14-16, 131:24-132:2 (recounting that the officers previously asked Smith to stay inside his apartment). If this was the officers' true basis for handcuffing Smith, then their decision was not sanctioned by the Patrol Guide, although a jury could nevertheless find their actions reasonable under the circumstances.

The City also argues that the decision to handcuff Smith was not the proximate cause of Smith's injuries. Instead, according to the City, his fall was the proximate cause. We agree with Smith that an injury was a foreseeable, and thus proximate, result of the decision to handcuff Smith. Recognizing that an arrest of a disturbed person is an inherently dangerous undertaking, the Patrol Guide discourages officers from handcuffing a disturbed person without special training and equipment. The risk that this rule seeks to avoid is that, if an untrained officer attempts to take a disturbed

9

person into custody, a struggle may ensue and someone will be injured. This result is certainly one view of the evidence in this case.

Finally, the City's procedural objections are without merit. Smith was not required to "plead" negligence in his Notice of Claim, which need only set forth sufficient facts for the City to investigate a reported incident. See Brown v. City of New York, 95 N.Y.2d 389, 393–94, 740 N.E.2d 1078, 1080 (2000). Although the negligence claim in Smith's amended complaint leaves much to be desired, the City was clearly on notice of Smith's negligence theory by August 2013, when Smith's expert relied on the Patrol Guide to opine that the officers were negligent even if the events occurred as the officers had testified. See Mem. of Walter Signorelli (Aug. 2, 2013) ¶ 13, ECF No. 102-3. Under these circumstances, the City does not attempt to explain how it is prejudiced in defending against Smith's negligence claim.

Smith has presented evidence that Officers Kurian and Lagara decided to handcuff him in contravention of official procedures, causing him to strike his head and suffer serious injuries. A jury may fairly conclude that this was negligence. Accordingly, the City's motion is denied.

## III. ST. BARNABAS' MOTION

### A. Transportation to the Hospital

The facts relevant to St. Barnabas' motion begin when the facts relevant to the City's motion end, with the police officers calling an ambulance to remove Smith. See Am. Stmt. of Undisputed Facts Pursuant to Loc. R. 56.1 ("Barnabas 56.1") ¶ 11, ECF No. 79. We recount the subsequent facts in the light most favorable to the City, i.e., facts indicating that malpractice on the part of St. Barnabas' EMTs contributed to Smith's injuries.

EMTs James Gelzer and Hiram Mack responded to a report of an intoxicated person at Smith's address. Id. ¶¶ 16–17. They arrived and proceeded to meet officers Kurian and Lagara on the second floor, where Smith's apartment was located. Id. ¶ 20.

EMT Mack examined Smith and recorded Smith's condition in his Ambulance Call Report as follows:

> Presumptive Diagnosis: Intox/Substance Abus. 57yrold male found P.D. handcuff laying on side naked with towel around waist Intox with substance abuse appears AOx2 [alert and oriented as to two factors:] place and name [but not time]. POSABC [positive airway, breathing, and circulation] verbal aggressive. Not under arrest handcuffed for safety and arrival of EMS. Pt resist getting up from floor for while. explain not under arrest stop resistance and aggression and we going to hospital. Pt calms down. PE [physical examination] reveals minor abrasion upon nose Pt does not recall what [illegible] how also mark on forehead. No

11

> other injury felt or seen No body fliulds.
> Patient states my body is soar [sic].
> transport naked with towel wrap around waist
> clothing black pants black top black leather
> jacket brought with him yellow shoes. Pt
> states <u>cant feel my body POSPMSx4 [positive
> pulse, motor, and sensation in four
> extremities]</u>. No SOB [shortness of breath]
> No chestpan [sic] pt remains talkative and
> stable during transport.

Ambulance Call Report at 3, Decl. of Michael W. Coffey in Supp. of Third Party Defs.' Mot. for Summ. J. ("Coffey Decl."), Ex. E, ECF No. 69 (emphasis added; otherwise, sic throughout). Mack testified that he checked for pulse, motor activity, and sensation only in Smith's fingers and toes, not in the rest of Smith's limbs. Dep. of Hiram Mack ("Mack Dep.") 48:25-49:13, Decl. of Sumit Sud in Opp. of Third-Party Defs.' Mot. for Summ. J. ("Sud Decl."), Ex. 2, ECF No. 101.

Besides Mack's report, Lagara says that he also informed the EMTs that Smith had fallen, <u>see</u> Dep. of Miguel Lagara 60:19-21, Sells Decl., Ex. 6, although St. Barnabas points out that this is not clearly supported by contemporaneous documents. According to Smith, Smith also told the EMTs that he did not have feeling in his limbs. <u>See</u> Barnabas 56.1 ¶ 30; Dep. of Andre Smith 183:20-22, Coffey Decl., Ex. N.

The EMT's moved Smith to the ambulance in a "stair chair," a transport device that does not immobilize the patient's

12

spine, and then drove Smith to St. Barnabas.  See Barnabas 56.1 ¶ 45.

Smith was admitted to St. Barnabas with a chief complaint of alcohol intoxication.  See Barnabas 56.1 ¶ 89.  Soon thereafter, a hospital resident recorded that Smith could not move his lower extremities and immediately placed Smith in a neck brace, following which an attending physician noted that Smith could not lift his legs off the stretcher.  See St. Barnabas Hosp. Med. Records at NYC3736, Coffey Decl., Ex. F; Barnabas 56.1 ¶ 91.  By the afternoon, Smith's chief complaint was listed as "quadriplegia" or "paralysis," see Barnabas Hosp. Med. Records at NYC3742, NYC3747, Sud Decl., Ex. 4, and an ICU consult recorded "acute compressive myelopathy [spine injury] caused by possible trauma on a chronically compressed [spinal] cord" with "no strength" in all four extremities.  See id. at NYC3747, NYC 3750.

A neurosurgical examination several days later revealed weakness in all four extremities.  See Barnabas 56.1 ¶ 99.  The physician removed Smith's neck brace and observed full range of motion in Smith's neck.  See id.  Smith's condition did not change following this exam.  See id. ¶ 103.

**B. EMT Procedures**

Upon responding to a dispatch, an EMT should assess the situation himself, instead of relying on a dispatcher's

13

description.  See Third-Party Pls.' Loc. R. 56.1(b) Stmt. of Additional Material Facts in Opp. to Third-Party Defs.' Mot. for Summ. J. ("City 56.1") ¶¶ 9-10, ECF No. 100.  The City maintains that an EMT should assess a trauma patient, including the victim of a fall, for motor and sensory activity through all four limbs, as a thorough motor and sensory examination can reveal spinal damage that examination of the fingers and toes alone cannot.[6]  Id. ¶¶ 19-20, 24-26 (citing Decl. of Dr. Thomas G. Kwiatkowski in Opp. to Transcare's Mot. for Summ. J., ECF No. 98).  If the EMT's examination reveals a possible spinal cord injury, then the EMT should remove the patient with a long board and neck collar in order to prevent further neck movement.  See Mack Dep. 44:25-45:15.

C. **Discussion**

The record contains sufficient evidence that EMT Mack's examination was negligent for the City to survive St. Barnabas' motion.

First, the parties disagree about how to interpret the Ambulance Call Report.  The City interprets the Report to mean that Smith said "can't move [my] body" within the apartment building.  St. Barnabas interprets the Report to mean that

---

[6] St. Barnabas disagrees, and contends that testing the fingers and toes alone is sound practice, because nerve damage will typically hinder motion at the ends of the limbs if it hinders motion anywhere.  We cannot resolve this "battle of the experts" at summary judgment.

14

Smith said "can't move [my] body" in the ambulance, after the EMTs had already moved him in a stair chair.  The "can't move my body" line falls in an ambiguous place in the Report, after a sentence about Smith's transportation, but before Mack's record of testing Smith's pulse, motor activity, and sensation.  The reasonable inference most favorable to the City is that Smith said "can't move my body" before Mack tested his pulse, motor activity, and sensation, i.e., while Smith was still lying on the hallway floor.

Second, at the summary judgment stage, we credit the testimony of the City's expert that an EMT faced with a possible trauma should test for motor activity and sensation along the entire length of the patient's arms and legs.

Third, there is some evidence that Smith's condition worsened between departing from the hallway and arriving at the hospital.  While EMT Mack observed movement in Smith's fingers and toes, the hospital resident detected no movement in Smith's arms and legs soon after Smith arrived at the hospital.  When combined with a favorable expert opinion, this apparent change in Smith's condition suggests that neck movements on the ambulance ride could have contributed to Smith's present condition.[7]

---

[7] St. Barnabas argues that this is impossible because Smith's condition did not deteriorate further after the February 9 exam, when Smith moved his neck

15

In sum, the evidence, viewed in the light most favorable to the City, shows (1) that the EMTs had cause to examine Smith for trauma, (2) that the EMTs failed to perform a reasonable examination, (3) that, as a result of failing to perform a reasonable examination, the EMTs failed to immobilize Smith's neck, and (4) that, by failing to immobilize Smith's neck, the EMTs contributed to Smith's injury. If this is the case, than St. Barnabas owes the City contractual indemnification or common-law contribution.

## IV. CONCLUSION

The motions for summary judgment (ECF Nos. 53, 58, 68) are denied. The parties shall confer and advise the Court within thirty days whether they wish to engage in further settlement negotiations or schedule trial.[8]

**IT IS SO ORDERED.**

Dated:  New York, New York
        August 4, 2015

NAOMI REICE BUCHWALD

---

through a full range of motion. This is not a convincing argument. There is simply no comparison between controlled neck movements a week after Smith's accident and uncontrolled neck movements on an ambulance ride immediately after the trauma, when Smith's congenitally compressed cord was already swollen and most susceptible to further injury. See Decl. of Dr. Adam Bender in Opp. to Transcare's Mot. for Summ. J. ¶ 14, ECF No. 97.

[8] The Clerk of Court is directed to terminate the New York City Police Department, Kurian in his official capacity, and Lagara in his official capacity as parties. Plaintiff's most recent complaint omitted the Police Department, which is in any event not a suable entity, and plaintiff seeks only money damages against Kurian and Lagara, a remedy that runs against them individually.

16

17

                                              UNITED STATES DISTRICT JUDGE

Case 1:12-cv-04922-NRB   Document 111   Filed 08/05/15   Page 17 of 17